53 F.3d 341
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jose Teofilo SOLORIO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bourne Bobby THOMAS, Defendant-Appellant.
 Nos. 93-50507, 93-50508.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 2, 1995.
Decided April 26, 1995.
 
 IN PART, REVERSED IN PART, AND REMANDED.
 
 
 1
 Before: D.W. NELSON and NOONAN, Circuit Judges, and KING,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Defendants-Appellants Jose Teofilo Solorio and Bourne Bobby Thomas were convicted of conspiring to sell methamphetamine and were sentenced to 121 months in prison. Their appeals were consolidated. Both Thomas and Solorio maintain that the government's conduct in this case was so outrageous as to violate due process. We disagree. Nor do we find merit in Solorio's claims that there was insufficient evidence to support the verdict against him or that his conviction should be reversed because of alleged prosecutorial misconduct. However, we hold that Thomas was entitled to a jury instruction on the defense of entrapment which the district court erroneously denied. Therefore, we affirm Solorio's conviction, and reverse Thomas' conviction.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 4
 Cristobal Crosthwaite-Villa's car had been seized by U.S. immigration officials as he was trying to cross the Mexican border into the United States illegally. Shortly thereafter, while Crosthwaite was in Tijuana trying to retrieve his car, he ran into his childhood friend, Albert Barruetta, a Mexican national living in Tijuana. Unbeknownst to Crosthwaite, Barruetta had become a professional informer for American DEA agents. Barruetta told Crosthwaite that for $1,000 he could get the seized car back and that he also could get him, illegally, a permit to live in the U.S. Crosthwaite accepted the offer and gave Barruetta $400 as a down payment.
 
 
 5
 During the following weeks, Crosthwaite repeatedly contacted Barruetta to talk about the car and his immigration problem. In the course of these conversations, Barruetta learned that Crosthwaite was a drug user. At trial, Barruetta testified that he could not recall discussing whether Crosthwaite had ever been involved in drug dealing or whether he would be willing to do so in the future. On several occasions, Barruetta illegally crossed the border to the United States in order to purchase rock cocaine to smoke with Crosthwaite.
 
 
 6
 On November 5, 1992, Barruetta met with DEA Agent Bruce Goldberg and told him that he knew an individual who was a major drug dealer and who could arrange for the purchase of methamphetamine. Without verifying Barruetta's claim that Crosthwaite was part of an ongoing organization distributing "multi-pounds" of methamphetamine, Agent Goldberg formally enlisted Barruetta as a confidential informant and directed him to pursue his lead. As in the past, Barruetta's financial agreement with the government was on a contingency basis. Under the agreement, the amount of money Barruetta would be paid depended on whether an investigation and prosecution was pursued, on the amount of drugs involved, and on the value of the assets seized. If, however, the operation was "unsuccessful," Barruetta would be paid only the minimum wage for his services. Barruetta, who has earned more than $50,000 for his services as an informant, was paid $2,200 for his contribution in this case as of a date preceding the trial.
 
 
 7
 When Crosthwaite agreed to obtain methamphetamine for Barruetta, he contacted Bobby Thomas for help. Although Crosthwaite did not consider Thomas to be a drug dealer, he knew that Thomas was a drug user and that in the past he occasionally had sold Crosthwaite $20 dosages of methamphetamine. Crosthwaite asked Thomas to help him find two or three pounds of methamphetamine. Barruetta met with Thomas on several occasions. As an incentive to participate in the drug deal, Barruetta offered Thomas some marijuana and cocaine, which Thomas did not accept. After some reluctance, Thomas agreed to participate in the drug sale. Thomas agreed to go along with Barruetta's plan in order to help his friend Crosthwaite. Thomas made clear that he did not want to speak with Barruetta unless Crosthwaite was present, and insisted that he would not participate in the transaction unless accompanied by Crosthwaite.
 
 
 8
 Finally, a deal was arranged for December 2, 1992. Barruetta informed the DEA agents that Thomas and Crosthwaite would sell three pounds of methamphetamine in exchange for $25,000. Thomas and Crosthwaite had told Barruetta that the drugs were supposed to be delivered by a third party who was driving in from Escondido. After waiting for about two hours, Agent Hinojosa decided to postpone the deal to the next day. It is undisputed that, until December 3, 1992, the day the deal actually took place, no one had mentioned Solorio's name as the courier for the deal.
 
 
 9
 Although there is a factual dispute regarding the events that took place on December 3, 1992, as soon as the drugs were delivered to Thomas, the DEA Agents arrested Thomas and Crosthwaite and, subsequently, Solorio, who had delivered the drugs to Thomas.
 
 DISCUSSION
 I. Outrageous Government Conduct
 
 10
 Thomas and Solorio contend that the government's activities were so outrageous as to violate due process. We review de novo the district court's refusal to dismiss the indictment on the basis that the government's conduct was not outrageous. United States v. Garza-Juarez, 992 F.2d 896, 903 (9th Cir. 1993), cert. denied, 114 S. Ct. 724 (1994). All underlying factual findings must be accepted as true unless clearly erroneous. United States v. Bogart, 783 F.2d 1428, 1434 (9th Cir. 1986).[1]
 
 A. Solorio's Standing
 
 11
 The government claims that the district court erred in concluding that, as a member of the conspiracy, Solorio has standing to assert the outrageous government conduct claim. We agree.
 
 
 12
 In United States v. Emmert, 829 F.2d 805 (9th Cir. 1987), the court held that one of the conspirators in that case "lacked standing to object to the government's activities ... [because] he was never an actual target in the conspiracy." Id. at 811. Thus, it is not true, as the district court assumed, that all members of a conspiracy have standing to object to government activities targeted at the conspiracy. Solorio concedes that during the three months of discussions between Crosthwaite, Barruetta, Thomas, and the federal agents, Solorio's name was never mentioned, nor was he seen by the agents before December 3, 1992. In light of Solorio's concession and the holding in Emmert, 829 F.2d at 811, we conclude that Solorio lacks standing to raise the outrageous government conduct claim.
 
 B. Thomas' Claim
 
 13
 It is undisputed, however, that Thomas has standing to raise the outrageous government conduct claim and, accordingly, we proceed to the merits. Thomas contends that the government's exploitation of the friendships between Barruetta and Crosthwaite and between Crosthwaite and himself amounted to outrageous government conduct. While this argument has some merit, we have repeatedly held that the government is permitted to exploit intimate relationships. United States v. Simpson, 813 F.2d 1462 (9th Cir.), cert. denied, 484 U.S. 898 (1987); see also United States v. Penn, 647 F.2d 876, 880-84 (9th Cir.) (en banc), cert. denied, 449 U.S. 903 (1980).
 
 
 14
 Thomas's central contention, however, is that the confidential informant, who essentially developed the crime, was paid a fee contingent upon conviction. The government did not contest this assertion until after we had filed our previous decision in this case, causing us to review the entire trial transcript anew, and to withdraw that opinion. The transcript does not establish that Barruetta's compensation was contingent upon obtaining convictions; it only establishes that he would receive payment for information that led to "successful" investigations. [RT: 343]. Moreover, the record reflects that Barruetta was paid $2,200 for his work on this case prior to trial. [RT: 343, 523] Nor is there any indication that Barruetta would receive additional compensation if Crosthwaite, Thomas and Solorio were ultimately convicted.
 
 
 15
 While it is reasonable to construe "successful" investigations as those resulting in convictions, the fact that Barruetta was compensated before trial suggests that "success" may have been understood to mean "resulting in arrest or prosecution," or "resulting in seizure of drugs and forfeited property." Barruetta testified that he "hope[d] to catch multi-pounds" but that he "[didn't] know till the case is done if they got the house or the car ...." [RT: 342] Arguably, the "case is done" when the jury renders its verdict, but this is not true in the forfeiture context, which appears to be the focus of Barruetta's remarks and of his compensation arrangement. See RT: 520-21, 533-34 (Agent Goldberg's testimony that the value of the assets seized is one of the factors considered in determining the informant's level of compensation).
 
 
 16
 Because the record does not establish that the informant's fee arrangement was contingent upon obtaining convictions, we cannot say that, under the totality of the circumstances, Thomas was subjected to outrageous government conduct.
 
 II. Solorio's Other Claims
 A. Sufficiency of the Evidence
 
 17
 Solorio contends that there was insufficient evidence of his involvement with the conspiracy. In resolving this issue, we must determine "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also United States v. Mares, 940 F.2d 455, 560 (9th Cir. 1991).
 
 
 18
 There is a factual dispute regarding the events that took place on December 3, 1992. According to the government, Barruetta, Crosthwaite, and the DEA Agents met at the "Big Bear" parking lot. Thomas, driving a motor home, arrived at an adjacent lot, referred to as the Long's drug store parking lot. Shortly thereafter, Solorio, who at the time lived in Escondido, arrived at the Long's parking lot driving a brown truck. The government contends that Solorio delivered the methamphetamine wrapped in newspaper to Thomas's motor home, then drove off, re-parking the brown truck in an adjacent lot. None of the officers, however, actually saw the person who delivered the drugs. Solorio eventually was arrested at the drug store after he re-parked the truck. Officer Perry Bryant, one of the arresting officers, testified that Solorio smelled of methamphetamine as did the brown truck he had been driving. At the time of arrest, Solorio was in possession of keys to the brown truck.
 
 
 19
 Agent Goldberg testified in front of the Grand Jury that his agents had seen Solorio deliver the drugs to Thomas outside of Thomas' motor home, but at trial he admitted that a portion of this testimony was inaccurate, as indicated by Officer Bryant's subsequent report and testimony. Officer Bryant testified that he saw someone get out of the brown truck carrying an object wrapped in newspaper, which he delivered to Thomas. Officer Bryant, however, testified that he could not actually see the object covered by the newspaper. Solorio contends that the newspapers that were found in the motor home belonged to Barruetta. Finally, the one fingerprint found on the box containing the drugs did not match Solorio's fingerprints.
 
 
 20
 It is undisputed that there was a conspiracy. Once the existence of a conspiracy has been established, "evidence of only a slight connection to the conspiracy" is sufficient to convict for participation in the conspiracy. United States v. Taylor, 802 F.2d 1108, 1116 (9th Cir. 1986), cert. denied, 479 U.S. 1094 (1987). Circumstantial evidence that Solorio was a member of the conspiracy is sufficient to support his conviction. United States v. Castro, 972 F.2d 1107, 1110 (9th Cir. 1992), cert. denied, 113 S. Ct. 1350 (1993). Viewed in the light most favorable to the prosecution, the circumstantial evidence presented here showed that Solorio drove the brown truck to the parking lot, transferred the drugs to the mobile home driven by Thomas, walked to the Long's Drug Store, and was later arrested. At the time of arrest, Solorio smelled of methamphetamine and was carrying the keys to the brown truck. Based on this evidence, the jury reasonably could have concluded that he was the person who delivered the drugs. Accordingly, we conclude that there was sufficient evidence to convict Solorio as a member of the conspiracy.
 
 B. Prosecutorial Misconduct
 
 21
 Solorio makes several claims of prosecutorial misconduct. According to Solorio, the prosecutor (1) misrepresented the evidence; (2) instructed the jury on a legal theory on which the district court had refused to instruct the jury; (3) asked leading questions to most of the government's witnesses; (4) misrepresented Solorio's post-arrest statement and impermissibly referred to his post-arrest silence in the closing argument; and (5) repeatedly asked the defense's witnesses "argumentative and prejudicial" questions, despite admonitions from the court. The government maintains that there was no misconduct, and that even if there were, that any error was harmless.
 
 
 22
 Solorio's trial attorney failed to object to the prosecutor's comments during closing argument. The defense's failure to raise a timely objection requires the appellate court to review the issue for plain error. See United States v. Tarazon, 989 F.2d 1045, 1051 (9th Cir.), cert. denied, 114 S. Ct. 155 (1993) (citing cases); see also United States v. Berry, 627 F.2d 193, 199 (9th Cir. 1980), cert. denied, 449 U.S. 1113 (1981). However, Solorio's other claims are based on statements and actions of the prosecutor to which his attorney did object and, thus, reversal is warranted if the misconduct, viewed in the context of the whole trial, more likely than not prejudiced Solorio. See United States v. Sanchez-Robles, 927 F.2d 1070, 1077 (9th Cir. 1991).
 
 
 23
 After carefully reviewing the record, we reject Solorio's claim of prosecutorial misconduct. The prosecutor did not misstate the evidence in the record regarding Crosthwaite's testimony about Solorio's brown truck. Nor did the prosecutor's reference to the chart outlining Crosthwaite's entrapment defense prejudice Solorio in any way, particularly in light of the trial court's curative instruction. We do find that the prosecutor's use of leading questions throughout her direct examination of witnesses was improper. Nevertheless, we hold that it is not more probable than not that the prosecutor's repeated use of leading questions materially affected the verdict, United States v. Christophe, 833 F.2d 1296, 1301 (9th Cir. 1987), particularly when the trial court sustained defense counsel's objections and sua sponte admonished the prosecutor.
 
 
 24
 Lastly, the record indicates that Solorio's post-arrest statements were spontaneous declarations. In fact, the defense did not challenge the declarations as violative of Solorio's Miranda rights. Accordingly, the prosecutor's reference to those remarks did not constitute a violation of Solorio's Fifth Amendment rights. United States v. Gordon, 974 F.2d 1110, 1116 (9th Cir. 1992). Nor has Solorio indicated how the prosecutor's paraphrasing of those remarks prejudiced Solorio. We conclude that, in light of the record as a whole, any impropriety in the prosecutor's closing arguments did not result in a miscarriage of justice. United States v. Olano, 113 S. Ct. 1770, 1779 (1993).
 
 III. Thomas' Entrapment Defense
 A. Entrapment As a Matter of Law
 
 25
 Thomas contends that he was entrapped as a matter of law and thus that he should have been acquitted. The district court not only denied Thomas's motion to dismiss on this ground, but also refused to instruct the jury on Thomas' proposed entrapment instruction, finding that there was not even slight evidence to support Thomas's entrapment defense. To justify acquittal as a matter of law, Thomas would have to show "undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act." United States v. Mkhsian, 5 F.3d 1306, 1309 (1993) (quotation omitted). In the present case, however, the evidence regarding both elements of the entrapment defense were disputed. There was testimony indicating that Crosthwaite and not Barruetta had convinced Thomas to sell the drugs, and that Thomas' reluctance was only reluctance to proceed directly with Barruetta and in the absence of Crosthwaite. In addition, the evidence that Thomas had previously supplied drugs to Crosthwaite disputes Thomas' contention that he was not predisposed. Accordingly, we reject Thomas's contention that he was entrapped as a matter of law.
 
 
 26
 B. Thomas' Right to a Jury Instruction on Entrapment
 
 
 27
 The district court denied Thomas' request to instruct the jury on an entrapment defense. In explaining the ground for its denial of the entrapment instruction, the district court stated,
 
 
 28
 I know there is some evidence that both the informant and Mr. Crosthwaite went to Mr. Thomas' home and talked to Mr. Thomas and that this constituted inducement, ... but I'm still of the opinion that the inducement for Mr. Thomas was to help his friend, to help him because he was in a bind and that there was no inducement by the Government.
 
 
 29
 Mr. Thomas was a source. Now he may have been only the source of personal-use quantities, but he was a source, and he had been selling or he had sold, or even if he didn't sell, give methamphetamine to Mr. Crosthwaite. So he already had been predisposed to be a source of methamphetamine. And so I find that entrapment was not [an] appropriate instruction to give as far as Mr. Thomas was concerned. [RT (6/25/93): 23-24]
 
 
 30
 There is a split of authority in the Ninth Circuit regarding the proper standard of review for the district court's determination that, based on the evidence presented, a defendant is not entitled to a jury instruction on his or her theory of the case. See United States v. Manarite, 44 F.3d 1407, 1417 n.15 (9th Cir. 1995); United States v. Kessee, 992 F.2d 1001, 1003 (9th Cir. 1993) (citing cases); compare United States v. Weitzenhoff, 35 F.3d 1275, 1290 (9th Cir. 1994) (applying de novo review), cert. denied, 115 S. Ct. 939 (1995), with United States v. Busby, 780 F.2d 804, 806 (9th Cir. 1986) (applying abuse of discretion standard). We need not decide this issue, however, because we conclude under either standard the trial court's decision not to instruct was erroneous. United States v. Becerra, 992 F.2d 960, 963 (9th Cir. 1993).
 
 
 31
 The district court should grant the defendant's request for an entrapment instruction if there is "a genuine issue of fact for the jury." United States v. Hoyt, 879 F.2d 505, 509 (9th Cir. 1989), amended on other grounds, 888 F.2d 1257 (9th Cir. 1989). "A defendant must present evidence on both elements of the defense, but only 'slight evidence is needed to create a factual issue and get the defense to the jury."' Kessee, 992 F.2d at 1003 (citations omitted); United States v. Sotelo-Murillo, 887 F.2d 176, 178 (9th Cir. 1989) (stating that the instruction must be given where there is "some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility") (quoting United States v. Yarbrough, 852 F.2d 1522, 1541 (9th Cir.), cert. denied, 488 U.S. 866 (1988); see also Kessee, 992 F.2d at 1003 (stating that "the defendant is entitled to an instruction unless the prosecution rebuts the evidence such that no rational jury could entertain a reasonable doubt as to either element") (quotation marks and citation omitted).
 
 
 32
 In this case, there was sufficient evidence that the government informant induced Thomas to commit the crime and that he was not predisposed for the question to be decided by the jury. On inducement, there was some evidence that Barruetta had contacted Thomas several times to convince him to participate in the deal. [RT: 353, 635, 694-95, 698-99] Although the district court opined that the Government's inducement was directed at Crosthwaite, the jury could have found otherwise.
 
 
 33
 On predisposition, the trial court's determination that Thomas was predisposed as a matter of law was incorrect. Under Ninth Circuit law, the government had the burden of showing that, prior to the initial contact by the government agent, Thomas was predisposed to commit the illegal acts. Mkhsian, 5 F.3d at 1310. According to the district court, the government met that burden by showing that Thomas had previously provided drugs to Crosthwaite. Thomas, however, had no prior criminal record and had never been involved in any major drug trafficking. Moreover, Crosthwaite's testimony that Thomas "didn't even want to deal at all" [RT: 678, 694] established a genuine issue of fact as to Thomas' predisposition. See United States v. Becerra, 992 F.2d 960 (9th Cir. 1993) (stating that among the five factors the court considers in determining predisposition, "the most important is the defendant's reluctance to engage in [the] criminal activity"); Sotello-Murillo, 887 F.2d at 181 (same). Although there certainly was sufficient evidence for the jury to conclude that Thomas had not been entrapped, under these circumstances the court should not have substituted its judgment for that of the jury. Kessee, 992 F.2d at 1004 (once defendant presents "some evidence" for each of the elements of entrapment "the weight and credibility of the conflicting testimony are issues properly resolved by the jury.") (quotation marks and citations omitted). Accordingly, Thomas' conviction must be reversed; if he is retried, the district court must instruct the jury on entrapment. Becerra, 992 F.2d at 964.
 
 CONCLUSION
 
 34
 We affirm Solorio's conviction. However, because Thomas was entitled to have the district court give an instruction on the entrapment defense, we reverse Thomas's conviction and remand for further proceedings consistent with this disposition.
 
 
 35
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 *
 The Honorable Samuel P. King, United States District Judge for the District of Hawaii, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 The court in Bogart subsequently vacated the part of the opinion in which it affirmed one of the co-defendant's convictions on the ground that he lacked standing to raise the outrageous government conduct claim. See United States v. Wingender, 790 F.2d 802 (9th Cir. 1986)